# Pennsylvania R. R. Co., Appellant, *v.* Braddock Electric Ry. Co.

[Marked to be reported.]

*Street railways—Crossings—Acts of 1871 and 1889.*

The act of May 14, 1889, P. L. 211, providing that any street railway company incorporated under that act shall have the right in its construction to cross at grade, diagonally or transversely, any railroad operated by steam or otherwise, is subject to the act of June 19, 1871, P. L. 1360, giving the court power to regulate grade crossings and directing them to prevent crossings at grade when reasonably practicable.

*Regulation of railroad crossings—Police powers.*

The manifest purpose of the act of 1871 was not merely to discourage grade crossings because of their danger to the public as well as injury to the company whose road is crossed, but also to prevent them, whenever in the judgment of the court it is reasonably practicable to avoid such dangerous crossings.

Being an exercise of the police power of the state, grants of franchises

are made and accepted in subordination thereto.  Nor is there anything in the title to the act of 1889 which conveys the slightest intimation of any intention to interfere with the jurisdiction theretofore conferred on courts of equity relating to railroad crossings at grade.

Argued Nov. 9, 1892.  Appeal, No. 283, Oct. T., 1892, by plaintiff, from decree of C. P. No. 1, Allegheny Co., Dec. T., 1891, No. 389, in equity, in favor of defendant.  Before PAX-SON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCH-ELL and HEYDRICK, JJ.

Bill in equity for injunction to restrain construction of electric railway across tracks of plaintiff's railroad at grade.  The bill contained an alternative prayer that should the court be of opinion that defendant had the right to make such crossing of plaintiff's tracks in any manner, the court would prescribe the place where and the manner in which such crossing might be made and used, and what precautions or provisions should be observed to best protect life and property.

On hearing of motion for preliminary injunction, the court, in an opinion by STOWE, P. J., 1 Dist. R. 111, ordered an injunction to issue until the court should be informed by sufficient evidence as to the safest and best manner of regulating and guarding the crossing.  The case being put at issue a commissioner was appointed to take testimony, and, upon the coming in of his report, the following facts were agreed upon by the parties :

Plaintiff company, incorporated in 1846, acquired, in 1850, under its power of eminent domain, a strip of land sixty-six feet in width through the land of Isaac Mills in what is now Braddock township, Allegheny county, Pa., for the construction and operation of its railroad, and upon this strip (which includes the point of crossing in controversy) shortly afterwards constructed and has since operated its railroad, consisting now, at Copeland station, the proposed crossing point, of four main tracks, to which is shortly to be added a fifth track. In addition to the main tracks there is also at present an additional track or siding leading into an ice-house on the south side of plaintiff's railroad and on the west side of the road below mentioned, upon which defendant's railway is constructed. Plaintiff has also constructed and erected upon its said right of way telegraph wires, and the signal appliances below re-

ferred to, which are in use and necessary for the operation of plaintiff's railroad. Plaintiff's railroad at the proposed point of crossing has a heavy grade descending eastwardly, being about forty-seven feet per mile. The four main tracks are used indiscriminately for freight and passenger traffic, and a large number of trains pass Copeland station daily upon said tracks. The number of regular daily trains in December, 1891, was two hundred and twenty-eight, of which about two hundred pass Copeland between 6 A. M. and midnight. In October, 1889, at No. 13, March sessions 1889, of the court of quarter sessions of Allegheny county, a road for public use was confirmed and ordered to be opened [sixty feet wide] from the northerly line of the borough of Braddock (being an extension of Fourth street in said borough), a distance of about twelve hundred and fifty feet, crossing plaintiff's railroad at grade, and extending to the public road from Braddock to Wilkinsburg which runs in this locality approximately parallel and near to plaintiff's railroad. This road was accordingly opened by the township supervisors, and has since been maintained and used as a township road. This road, however, had previously existed on both sides of plaintiff's tracks through dedication to public use by the owners of the land upon plans laid out by them. The plaintiff owns in fee a lot of land on the southern side of its railroad adjoining its right of way and abutting or fronting upon the said road, and on this lot are located the Copeland station buildings. Approaching plaintiff's tracks from the southern side the said road for a distance of one hundred and fifty feet from the centre of plaintiff's tracks rises at a grade of ten and one half feet in the hundred, and after crossing plaintiff's tracks continues to rise on the north side thereof at the rate of six and nine tenths feet per hundred to the public road between Braddock and Wilkinsburg, called Charles street or Hawkins avenue. On the west side of the said road on the north and south sides of plaintiff's tracks are buildings which interfere with the view of plaintiff's tracks by any one approaching the same upon the road, but when one has reached plaintiff's tracks they can be seen, if not occupied by trains, for a distance of about nineteen hundred feet to the west and about thirteen hundred feet to the east from the crossing. West of the said road on both

sides of plaintiff's tracks are several streets or highways dedicated to public use leading to, but not crossing, plaintiff's right of way. The topography is such that at First street, about seven hundred feet west of the said road, it would be practicable to cross plaintiff's tracks by means of an overhead crossing or bridge. A substantial structure spanning plaintiff's right of way would cost from $6,000 to $7,000, exclusive of approaches on the south side, which would have to be constructed above the natural grade of the ground with the consent of property owners affected thereby. A short distance east of the said road a crossing beneath plaintiff's tracks is also practicable, but at considerably greater cost, and in part through private property.

On June 9, 1890, defendant company was incorporated under the act of May 14, 1889, with authority to construct, maintain, and operate a street railway for public use in the conveyance of passengers by power other than locomotive upon certain streets and highways in Braddock borough and Braddock township, but not including or covering the road at the crossing here in controversy. Pursuant to the power given by said act defendant company on July 29, 1890, Jan. 15, 1891, and May 22, 1891, by action of its board of directors, changed or modified its route, one of these modifications or extensions (that of July 29, 1890) covering the road and the crossing here in controversy. In February, 1891, the then supervisors of Braddock township gave their written consent to the construction of defendant's railway. On June 9, 1891, defendant asked consent of plaintiff to construct at the expense of defendant a bridge for its electric railway to cross plaintiff's tracks overhead at First street. No definite reply was given immediately to this request, the delay, as explained by Mr. Robert Pitcairn, plaintiff's general agent and superintendent, to whom defendant's letter was addressed, being by reason of an effort made by him to effect an arrangement with the supervisors of Braddock township, under which plaintiff company might, at its own expense, construct a bridge over its railroad at some suitable point near Copeland which would furnish an overhead crossing both for general travel and for the electric railway, so as to abolish the grade crossing of the road at Copeland station. On Aug. 20, 1891, Mr. Pitcairn, on behalf of plaintiff, wrote to

the defendant a letter, intended, as he says, to express plaintiff's assent to the construction of the bridge as proposed by defendant's letter of June 9th, but which defendant says it understood to be an assent to the construction of an overhead bridge on the road at Copeland station instead of at First street. Defendant having let its contract for the construction of its railway upon the road crossing plaintiff's tracks at grade at Copeland, this bill was filed. Defendant has constructed its railway upon and along the said road on both sides of plaintiff's tracks, with an overhead trolley wire carrying the electric current, which trolley wire is supported by cross wires and poles set in the ground erected on both sides of the road or highway, and upon this railway so constructed (at present a single track) proposes to operate and run street cars by electricity, crossing plaintiff's tracks at grade from the southern side to the northern.

Plaintiff has in use upon all of the tracks of its railroad between Pittsburgh and Stewart station, a distance of about seventeen miles (and thus extending beyond or east of Copeland station), a system of signals necessary for the operation of its trains, known as the automatic-pneumatic electric system. Under this system the railroad is divided into sections of about one half mile each, and at the end of each section are located for each track two signals, known respectively as the home and distance signals, the home signal indicating the condition of the section of track first in advance and the distance signal indicating the condition of the section second in advance. These signals are operated by an electric current, of which the rail of the track is the conductor. Anything which makes a metallic connection between the two rails of the track, as, for example, the wheels and axles of an engine or car, permits the electric current to pass from one rail to the other, and thereby automatically moves the signals at the end of the section, the home signal indicating danger and the distance signal indicating caution. The construction of defendant's railway makes a metallic connection between the two rails of each one of the plaintiff's main tracks, and would render useless the signals on that section unless some means were taken to overcome the difficulty. So far as the operation of the signals is concerned, it is practicable to overcome the difficulty by insulating the

the rails of each track on both sides of the proposed crossing and connecting the rails between the insulated points, using as conductors underground wires instead of the rails themselves. While this restores the operations of the signals as to the section generally it necessarily cuts out of and disconnects from the signal system that portion of each of plaintiff's tracks between the insulated points on both sides of the crossing (being a distance of two rail lengths, or about sixty feet), so that an obstruction of any sort on plaintiff's tracks between the insulated points or on defendant's track upon the crossing would have no effect upon the signals.

The court, after argument, entered a decree dissolving the injunction previously granted, sustaining defendant's right to cross at grade, and prescribing the terms upon which defendant should construct and operate its grade crossings, in opinion by Stowe, P. J., 1 Dist. R. 626. .

*Errors assigned* were (1) decree that defendant has the lawful right to construct, maintain and operate its street railway upon the road crossing the tracks of plaintiff's railroad at or near Copeland station or (2) upon plaintiff's tracks at grade at or near Copeland station; (3) in not decreeing that defendant be enjoined from constructing and operating its railway upon or across the tracks and property of plaintiff; (4) decree that plaintiff pay the costs.

*William Scott, George B. Gordon* with him, for appellant.— The road upon which defendant proposes to construct its electric railway across plaintiff's tracks in front of plaintiff's station lot is not a public highway, the proceedings of the quarter sessions purporting to authorize the opening thereof as a township road being void, as in excess of the statutory width: Act June 13, 1836, §§ 4, 5, P. L. 555; Silver Lake Road, 3 W. & S. 559; Bridgewater Road, 4 W. & S. 39; Norriton Road, 4 Pa. 337; Ewings Mill Road, 32 Pa. 282; Torrance v. Torrance, 53 Pa. 505; Shumate v. McGarity, 83 Pa. 38; Bennett v. Hayden, 145 Pa. 586. Jurisdiction depends on the power to enter the particular judgment: Winsor v. McVeigh, 93 U. S. 274; Wall v. Wall, 123 Pa. 545; Phillips's Ap., 34 Pa. 489.

The act of May 14, 1889, under which defendant is organized, does not authorize the formation of a corporation for the

construction and operation of passenger railways extending through several municipal districts. The office is to be maintained where said railroad is located: § 12. The powers are to be exercised in "any city, borough or township:" §§ 14–16.

The consent of the supervisors was not the consent of the " local authorities : " Endlich on Interpretation of Statutes, § 34; Com. v. Bank, 3 W. & S. 173; Pittsburgh's Ap., 115 Pa. 4. The act of April 15, 1834, enumerates their powers. The act of June 13, 1836, § 6, requires them to keep the highway clear of all impediments.

The act of May 14, 1889, does not authorize the construction and operation of a passenger railway upon a township road in the county in express terms, and in so far as it may be regarded or construed as impliedly intended to confer such power, it is unconstitutional in that its title confines the act to street railways : Phœnixville Road, 109 Pa. 49; Dorsey's Ap., 72 Pa. 192; Union Pass. Ry. Co.'s Ap., 81*Pa. 91 ; Beckert v. Allegheny, 85 Pa. 191; Rogers v. Improvement Co., 109 Pa. 109; Sewickley Borough v. Sholes, 118 Pa. 165; Ridge Ave. Ry. v. Phila., 124 Pa. 219; Rogers v. Improvement Co., 109 Pa. 109.

Defendant company does not possess the franchise of constructing and operating its electric railway and appurtenances upon said road across plaintiff's tracks at grade and in front of plaintiff's station lot without plaintiff's consent, the construction and operation of such railway upon a country road being a servitude beyond the highway easement, inflicting a special injury upon plaintiff, and the act of May 14, 1889, in so far as it purports to grant such franchise or right, is unconstitutional, in that it attempts to authorize the taking or injuring of private property without compensation: Const., art. 16, § 8 ; Sterling's Ap., 111 Pa. 35 ; Bloomfield & Rochester Nat. Gaslight Co. v. Calkins, 62 N. Y. 386; Kincaid v. Indianapolis Nat. Gas. Co., 124 Ind. 577; Cooley, Const. Lim., ed. 1890, p. 683 ; Detroit City Ry. v. Mills, 46 A. & E. R. R. Cas. 608 ; Lewis, Eminent Domain, § 124; Western Union Tel. Co. v. Williams, 86 Va. 696 ; s. c., 30 A. & E. Corp. Cas. 564, and 2 Am. R. R. & Corp. Rep. 258 ; Board of Trade Tel. Co. v. Barnett, 107 Ill. 507 ; American Tel. & T. Co. v. Smith, 71

Md. 535; Dusenbury v. Mutual Union Tel. Co., 11 Abb. N. C. 440; Metropolitan Tel. & Tel. Co. v. Caldwell Lead Co., 50 N. Y. 488; Tiffany v. U. S. Illuminating Co., 67 How. Pr. 73; Broome v. N. Y. & N. J. Tel. Co., 42 N. J. Eq. 141; Roake v. American Tel. Co., 41 N. J. Eq. 35; Atlantic & Pacific Tel. Co. v. R. R., 6 Biss. 158; Western Union Tel. Co. v. Rich, 19 Kans. 517; New Orleans R. R. v. Southern & Atlantic Tel. Co., 53 Ala. 211; Taggert v. Newport St. Ry., 2 Am. R. R. & Corp. Cas. 57, note; Western Union Tel. Co. v. American Union Tel. Co., 65 Ga. 160; B. & O. Tel. v. Morgans La. & Tex. R. R., 37 La. Ann. 883; 2 Dill. Mun. Corp. p. 898.

If defendant is entitled to cross at grade, it would seem to have the " perverse and arbitrary right to do so regardless of the rights of the corporation injured thereby, and of the safety of the public," which this court denied to a corporation under the general railroad act of 1868 in Pittsburgh & Connellsville R. R. v. South West Penna. Ry., 77 Pa. 185, although the terms of the act of 1868 in this regard are as absolute as those of the act of May 14, 1889.

*William A. Stone* and *W. P. Potter*, for appellees.—Plaintiffs took their property with full knowledge of the fact that the street or road was in existence as a public highway.

There is nothing in the act under which defendant is organized limiting its operations to one municipality. It refers to any street or highway without regard to municipal lines. The universal construction has been that the act permits the construction of street railways through more than one municipality.

The act of April 15, 1834, provides that the corporate powers of a township shall be exercised by the supervisors thereof.

The term "street railway" in the title of the act is used in the sense which distinguishes it from a steam railroad: Millvale Borough v. Evergreen Ry., 131 Pa. 14; Allegheny Co. Home's Ap., 77 Pa. 77; Elliott on Roads, 557.

The construction of an electric railway on a country road is not an additional servitude: Lockhart v. Craig, 139 Pa. 419; Rafferty v. Traction Co., 1 Adv. R. 419; Elliott on Roads, 529; Phila. & Trenton R. R., 6 Wh. 41; Com. v. E.

& N. E. R. R., 27 Pa. 354; Mercer v. R. R., 36 Pa. 104; O'Connor v. Pittsburgh, 18 Pa. 189; Pa. R. R. Co.'s Ap., 115 Pa. 526; Faust v. Pass. Ry., 3 Phila. 164; Hodges v. Pass. Ry., 58 Md. 603; Clark v. Pass. Ry., 3 Phila. 259; Elliot v. Fairhaven R. R., 32 Conn. 579; Williams v. Ry., 41 Fed. R. 556; State v. Ry., 79 Me. 363; Halsey v. Ry., 20 Atl. R. 859; Newell v. Ry., 35 Minn. 112.

OPINION BY MR. JUSTICE STERRETT, January 3, 1893 :

We quite agree with the learned president of the common pleas in saying " that a grade crossing at the place selected by defendant is so exceedingly dangerous that it should not be allowed if there is any power in the court to prevent it; " but we are not prepared to assent to his conclusion that the court has been shorn of that power by the eighteenth section of the act of May 14, 1889, under which defendant company was incorporated.

It is impossible to consider the testimony in this case, in connection with the statement of facts agreed upon by counsel, without being forced to the conclusion that the crossing in question is one of those death traps which should not be permitted to exist in any community. One of the witnesses, whose large and varied experience as a railroad superintendent entitles his opinion to great weight, says : " My own judgment in regard to a street crossing, either by horses, electricity or cable, is that any one attempting such a crossing at camp Copeland is no less guilty than a man who would in cold blood murder his fellow being. . . . I mean by that, what I have said to these people, that no power on earth, nor any arrangement, nor any mechanical, electrical or other device that I am personally aware of at present, can prevent the loss of life." Again, speaking of electric roads, he further testifies : " I can say from personal observation that an electric street railroad is the most dangerous of all street car railroads, from the fact that there are two parties in control, the motorman in front with his electricity and the conductor in the rear with his trolley—and unless they both act in unison and fully understand what each other desires to do, trouble ensues. A conductor on the rear end of the car can place the motorman entirely helpless. In crossing the railroad at such points as Copeland there is great danger—as I have

personally noticed in Pittsburgh—of their trolley being discon-
nected and the car stopping."

Without further reference to the testimony, it is sufficient
to say, that the very frequent and rapid passage, to and fro, of
trains on the four tracks of plaintiff's road (over two hundred
daily between six o'clock, A. M., and midnight), the descending
grade and curvature of said tracks, obstructed view, in short,
all the environments of the crossing, co-operate in making it
exceedingly perilous, so exceptionally dangerous, indeed, that
it is surprising the directors of defendant company are willing
to imperil the lives and limbs of their patrons by attempting to
cross at grade.

It is conceded that the topography of the vicinity is such,
that, at First street, about seven hundred feet west of defend-
ant's road, it would be practicable to cross plaintiff's tracks by
means of a substantial overhead viaduct or bridge, spanning
plaintiff's right of way and costing from $6,000 to $7,000, ex-
clusive of approaches on the south side ; that, " a short distance
east of the said road, a crossing, beneath plaintiff's tracks, is
also practicable, but at considerably greater cost, and in part
through private property."

More than twenty years ago, the necessity for special judicial
control of corporations, and especially railroads, assumed tangi-
ble form in passage of the act of June 19, 1871, entitled " An
act relating to legal proceedings by or against corporations : "
P. L. 1360.

The first section provides that in all proceedings in which it
is alleged that the private rights of individuals or the rights
or franchises of other corporations are injured or invaded by
any corporation, etc., it shall be the duty of the court to examine,
inquire, and ascertain whether such corporation does in fact
possess the right or franchise to do the act or acts complained
of, and, if it does not, to restrain such injurious acts, etc.

The second section declares : " When such legal proceedings
relate to crossings of lines of railroads by other railroads, it
shall be the duty of the courts of equity of this commonwealth
to ascertain and define by their decree the mode of such cross-
ing which will inflict the least practical injury upon the rights
of the company owning the road intended to be crossed ; and,
if in the judgment of such court it is reasonably practicable to

avoid a grade crossing, they shall by their process prevent a crossing at grade."

· The manifest purpose of this is not merely *to discourage* grade crossings because of their danger to the public as well as injury to the company whose road is crossed, but also to *prevent* them whenever in the judgment of the court it is reasonably practicable to avoid such dangerous and injurious crossing.   As an exercise of the police power of the state, the wisdom of the provision has become more manifest, from year to year, as railroads multiply.   Referring to the general necessity for exercising the restraining power thus conferred on courts of equity, the present Chief Justice, in Perry County Railroad, etc. v. Newport, etc. Railroad Co., 150 Pa. 193, 199, says : " The time for grade crossings in this state has passed.   They ought not to be permitted, except in case of imperious necessity.   They admittedly involve great danger to life and property.   In the earlier period of railroads this danger was overlooked, or, at least, disregarded.   The desire of the people for this species of improvements tended to close their eyes to the dangers involved.   The traffic then upon railroads was comparatively light, and trains ran at long intervals.   The rapid development of the country, the enormous growth in wealth, population and business, has materially changed the relations of railroads to the public and to each other.   The result is that we now see railroad companies and municipalities spending enormous sums in correcting the defects of earlier railroad construction, and especially in avoiding grade crossings.   We must, therefore, construe the act of 1871 in accordance with our present surroundings."

It is claimed by defendant, however, that the eighteenth section of the act of 1889, under which it is incorporated, expressly authorizes it " to cross at grade, diagonally or transversely, any railroad operated by steam or otherwise, now or hereafter built."

If by the language thus employed the legislature intended not only to barter away the police power of the state in regard to such grade crossings, but also to limit the jurisdiction of courts of equity in relation thereto, then, indeed, the learned judge fitly characterized such legislation as " exceedingly vicious," but we cannot think any such construction as that·

should be given to § 18 of the act (art. 16, § 3, const.). It is a well recognized principle of legislation that grants of franchises are made and accepted in subordination to the police power of the state. This results from the inherent nature of that power, which, " in its broadest acceptance, means the general power of a government to preserve and promote the public welfare, even at the expense of individual rights:" 18 Am. & Eng. Enc. L. 740. The exact scope of the term is not easily defined, but all agree that it " extends to the protection of ·life, limbs, health, comfort and quiet of all persons, and protection of all property within the state, according to the maxim *sic utere tuo ut alienum non laedas:*" Thorpe v. Railroad Co., 27 Vt. 149. In Com. v. Alger, 61 Mass. 53, Mr. Chief Justice SHAW speaks of it as a settled principle, growing out of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to others or to the rights of the community. The principle finds appropriate expression in the maxim, *salus populi suprema lex.* " Franchises are always granted subject to the police power. The doctrine that grants of franchises are contracts has also been frequently invoked in efforts to protect corporations from the operation of laws passed in pursuance of the police power of states. But all ·agree that the legislature cannot bargain away the police power of the state:" 8 Am. & Eng. Enc. L. 621, and notes. We are, therefore, warranted in concluding that a surrender of that power was neither affected nor intended to be made by the act under consideration. Nor, do we think that the jurisdiction, conferred by the second section of the act of 1871, was in any manner restricted or limited by the act of 1889. As we have seen, the latter is entitled " An act to provide for the incorporation and government of street railway companies in this commonwealth." This title conveys not the slightest intimation of any intention to interfere with the jurisdiction theretofore conferred on courts of equity relating to railroad crossings at grade.

The tenth section of the general railroad act of April 4, 1868, provides that " railroad companies formed under the provisions of this act shall have the right to construct roads so as

to cross at grade the track or tracks of any other railroad in this commonwealth." In Pittsburgh etc. R. R. Co. v. Railroad Co., 77 Pa. 173, it was held that the exercise of this right was subject to judicial control. It was there said: "The appellee was subjected to the operation of the act of June 19, 1871. Under the act of 1868, the place where and the manner in which one railroad might cross another at grade were undoubtedly subjected to review by a court of equity. The fact that it might cross at grade gave it no perverse and arbitrary right to do so, regardless of the rights of the corporation injured thereby, and of the safety of the public. Every legislative grant is made with the implied reservation that it shall not injure others: Com. v. Penna. Canal Co., 66 Pa. 42. Railroads are public highways. They cannot, therefore, for all purposes, be considered private property only. As they possess a public character, they are subject to public supervision. Besides we cannot presume the legislature ever intended to divest itself of the exercise of the police power of the state. The right to regulate railroad crossings naturally flows from that reserved power. . . . Moreover, the evident intendment of the statute is to discourage crossing at grade. . . . Each succeeding year will increase the necessity for avoiding them. Their construction should now and henceforth be discouraged."

We have no doubt electric railways are within the purview of the act of 1871. They are certainly within the mischief for which the second section provides a remedy. In Hestonville R. R. Co. v. Phila., 89 Pa. 210, it was held that the act of May, 1861, entitled an "act relating to railroad companies," included passenger railway companies. This was approvingly followed in Citizen's Pass. Railway Co. v. Pittsburgh, 14 W. N. 268, wherein it was held that the real estate of a passenger railway company was within the meaning of an act making real estate of "railroads" liable to taxation.

The view we have thus taken of the main question renders unnecessary the consideration of minor questions presented by the record.

Decree reversed, with costs to be paid by defendant, and record remitted to the court below with instructions to enter a decree perpetually enjoining defendant from crossing plaintiff's road at grade, etc.