## Altoona & Philipsburg Connecting R. R. *v.* Tyrone & Clearfield R. R., Appellant.

*Railroads—Crossing of one railroad by another—Act of June* 19, 1871.

The practicability of overhead crossings depends almost entirely upon the circumstances of each particular case.    Among the factors to be considered are the location and surroundings of the proposed crossing, the character of the railroads, and the uses made and intended to be made of

them, the increased cost of construction, and expenses of operation, the public safety and convenience, and the interests and convenience of the road intended to be crossed.

Four grade crossings within eight miles will not be permitted where it is reasonably practicable to construct overhead crossings at a cost of from $12,000 to $15,000 for each crossing.

Argued Jan. 26, 1894. Appeal, No. 93, Jan. T., 1894, by defendants, from decree of C. P. Clearfield Co., Sept. T., 1893, No. 2, on bill in equity. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ. Reversed.

Bill in equity under act of June 19, 1871, P. L. 1361, to regulate crossing of one railroad by another.

The case was heard by the court, without reference to a master. The following opinion was filed by KREBS, P. J.:

" The bill in this case involves the question of the plaintiff company's right to cross five branches of the defendant company's line between Philipsburg, its northern and eastern terminus, and its connection with the Beech Creek Railroad and its southern and western terminus at Janesville. For a proper understanding of what is involved in this controversy on the one side and the other, we deem it of the utmost importance that there should be set out as briefly but as clearly as may be the following details : (1) A statement of the topographical position of the territory traversed by these lines of railroad as constructed and projected. (2) The position of the field in its geological aspect as a freight-producing field and its importance in this respect. (3) The finding of the admitted or undisputed facts in the case as they bear upon the merits of the controversy in hand in relation to all of the five branches sought to be crossed. (4) The findings of the facts as they relate to each separate branch. (5) The statement of the law. (6) The appropriate decree for each crossing.

" The topographical position of the territory traversed by these lines of railroad already constructed and now projected is deemed material because it bears directly upon the location of the lines as laid down and constructed and in process of construction. It will hardly be disputed that where a line of railroad has been constructed and in operation, whether for a long time or a short time, with its branches and laterals running out

from it, that a new line entering the field must so locate its lines as to do the least amount of injury, consistent with any reasonable expenditure of capital, to the older and first located and constructed line, in its operation, both as to the main stem and its lateral feeders or branches. The topography of the country is therefore material, and is an existing fact, open to the notice of the court, whether fully in proof or not. Much may be gleaned from the evidence of the witnesses in the case, in addition to what is notorious to all who have studied the geological formation of the first bituminous coal basin.

" The general trend of the crest of the Allegheny mountains is northeast and southwest, and on the western slope the Moshannon creek and its tributaries flow in a northeasterly direction for quite a long distance. The valley of the stream is narrow, with the hills rising in most portions of its course close from its banks. Starting at Philipsburg and going in a southerly direction up the stream, the tributary coming in on the northern and western side is the Crowell run, up which is constructed the Mapleton branch of the Tyrone & Clearfield Railroad. Farther to the south, and west of the Osceola mills is the next, or Big run; still farther south and west is Coal run. Near this point Beaver run enters the Moshannon creek, and to the south and west Goss run enters Beaver run. The country between these streams is elevated, the hills rising anywhere from fifty feet to two hundred above ordinary water level. The valley of some of these streams, particularly Big run and Coal run, is quite narrow and precipitous. Goss run has a wider valley, and the rise both of the stream and the hillsides is not so abrupt as the others.

" The defendant company's line of railroad from Philipsburg in a southwestwardly direction towards Osceola mills and beyond, constructed prior to 1869, traverses the valley of Moshannon creek along the eastern side thereof, following the hillside so as to obtain and preserve its gradients until it reaches Osceola mills, where it crosses the Moshannon creek to the western side and continues along its western side until it reaches the mouth of Beaver run, where it leaves the Moshannon and follows Beaver run to its head at or near Ramey. This will fully appear by defendant's exhibit.

" The first spur or branch, south of Philipsburg, of the defend-

ant's line, and known in this case as the Mapleton branch No. 1, was constructed as much as twelve years ago. On the defendant's exhibit —— it will be seen that since that time, and prior to the location of the plaintiff's line of road, there have been two sub-branches of the first Mapleton branch constructed, which unite near the point where the plaintiff's line seeks to cross this branch of defendant's line.

" The second branch, and known in this case as the Big Run branch, was constructed about four years ago up the valley of Big run.

The third branch, and known as the Coal Run branch, was constructed up the valley of Coal run about twelve years ago, and has since been extended from time to time across the summit at the end of the valley.

" The fourth branch, and known as the Goss Run branch, was constructed up Goss run more than twelve years ago.

" The fifth branch, and known as the Amesville branch, leaves the main stem beyond Houtzdale and crosses over the summit and descends into the valley of Upper Morgan run, and has been built, part of it, as much as six years ago, and the balance of more recent date.

" Each and all of these laterals extend in a westerly direction up these several streams entering Moshannon creek or its tributary Beaver run on their northern and western side.

" That on the —— day of ——, A. D. 18——, the Moshannon & Clearfield Railroad Company was organized, and that all of the main branch, beginning in the Osceola yard and extending south and west, then constructed as far as Ramey or beyond, is operated under that name, and that all the branches crossed, except the Mapleton, join the Moshannon branch of the Tyrone & Clearfield Railway and appear to be part and parcel of it.

" The second inquiry, which pertains to the field traversed by the plaintiff's and defendant's line of railroad in its geological aspect, is important in that it bears upon the question not only of the lines of roads themselves, but has much to do with the effect of future and further development of those seams or veins of coal of the first bituminous coal basin that in this particular portion thereof lie below water level. The facts pertaining to this case are these :

" The first bituminous coal basin lies west of the crest of the

Allegheny mountains, and the general trend is northeast and southwest. At Philipsburg and Houtzdale there is no difficulty in defining the position of the basin. Its central line or axis is almost exactly coincident with the course of Beaver run from or beyond Ramey on the west, passing through Houtzdale and east from there some short distance. It then runs about north 60 degrees east, and continues nearly in this course until it reaches a point near Philipsburg. The general course of the Moshannon creek from Philipsburg, in a southerly and westerly direction to the south of Beaver run, is not far at most points from the central axis of the basin as above stated.

" [The small courses, entering the main stream of Moshannon creek at or near the Mapleton branch, Big Run branch and Coal Run branch, cut through the upper measures of this field, but, as appears by the testimony of Mr. Womelsdorff (called by defendants), the vein or measure known as ' B ' in geological nomenclature in this field, is under the water level of Moshannon creek at Mapleton branch, Coal Run branch, Goss Run branch and the Amesville branch at its junction with the Moshannon & Clearfield Railroad of the defendant company's line. The extension, however, of the Amesville branch has reached a field of very large acreage of this vein that can be mined through drifts above water level. At the Big Run branch the ' B ' vein can in all probability be opened above the water level of the Moshannon creek.

" That on account of the location of the axis of the basin, the amount of development of this ' B ' vein, the largest known measure, and proportionately of greater value in the future, must necessarily be as near the line of axis as possible to be practical, and the future shipments over the outer extensions of Mapleton, Big Run, Coal Run and Goss Run branches will not in any probability be any larger than they have been in the past before the exhaustion of the Moshannon vein to its present state.] [1]

" Upon the third point, as to the facts that are undisputed and that relate alike to all the five branches, there are but a few, and they may be stated thus:

" *a.* These branches were originally built as a part of the Tyrone & Clearfield Railway Company, and it is supposed under an assumed authority that its charter contained branching

powers, which is very doubtful; but if there was no power, still it could not be questioned in this proceeding.

" [*b.* They were all and each in their inception and construction for the development of the coal of private individuals owning lands along them or at the end thereof, and to afford means of transporting the coal to a distant market, and might more appropriately have been constructed under the 'Lateral Railroad Act' as coal branches.] [2]

" *c.* That, with the exception of the Goss Run branch, no passenger trains are now or ever have been run upon any of them, and upon the Goss Run branch a distance of not over one mile from its junction with the main stem now operated under the name of the Moshannon & Clearfield Railroad Company, as stated hereinbefore.

" [*d.* That except upon the Goss Run branch, as seen in paragraph '*c,*' nothing but freight trains, mainly of coal alone, ever enter upon these branches, and that not more than two on any day, and generally but one a day, go in with empties and return with the loaded cars from these branches.] [3]

" [*e.* That the coal seam or vein known as ' D,' or the Moshannon vein, was the measure then sought for more particularly, and because of its elevation in the hill, to reach and properly develop it is in some degree at least the cause of the heavy grades upon these branches and the controlling cause of the length thereof, as they exist at the present time.] [4]

" [*f.* That owing to the topography of the country, the manner the water streams enter the Moshannon creek, and the approach of the hillsides to the same, the Altoona & Philipsburg Connecting Railroad could not have located their line of road on any other ground, so as to secure a line of road that could be operated with reasonable practicability. It was not absolutely impracticable to locate and build a different line upon ground elevated over some one or more of the defendant's laterals, so as to have enabled overhead crossings to be constructed; but from long acquaintanceship and knowledge of the country, derived from careful study of the coal strata, we find as a fact that owing to the curvatures and gradients, and the very greatly increased cost of construction, no sensible engineer would have adopted any other route or location than that adopted by the plaintiff company at the points of crossing in

controversy, except that an undergrade crossing is reasonably practicable at Amesville branch as is hereinafter set out.] [5]

" [*g.* That overhead crossings at each of the four branches, Mapleton, Big Run, Coal Run and Goss Run would increase the grades very much at each of these points and greatly affect the operation of the Altoona & Philipsburg Connecting Railroad, both in its capacity to haul freight over these humps, as also in the matter of operating expense by requiring greatly increased power at each of these humps; while the amount of injury done to the defendant company and the inconvenience in the future operation of the branches in question can easily be compensated in damages.] [6]

" This brings us to the fourth paragraph of the case as outlined, namely, the findings of fact as they relate to each separate branch sought to be crossed. The bill of complaint unites them all in one proceeding, but they must be dealt with as distinctly as if separate and distinct bills had been filed in the case of each crossing. We will therefore proceed with them, beginning at Mapleton branch, and will set forth the facts, omitting only those general facts that we have already stated pertain alike to all.

" MAPLETON BRANCH.

" 1st. The point of crossing is situate from the junction with the Tyrone & Clearfield Railroad about one mile.

" 2d. That the Mapleton branch is in reality three branches known as Nos. 1, 2 and 3, and the point of junction of Nos. 1 and 2 is at or near the point of crossing in controversy, No. 3 running out from No. 2 and forming part thereof.

" 3d. The cars brought down from the coal operations at the head of No. 3 are run down upon No. 2 and there united with the train before being brought out over the point of crossing, so that in point of fact No. 3 does not enter into consideration in the case except as it is a part of No. 2.

" [4th. That the location of the Altoona & Philipsburg Connecting Railroad at this point is the only reasonable one consistent with good railroad construction and operation, owing to the topography of the country. That to change the location as proposed by the defendants would affect the curvature of the line so as to materially affect the operation thereof, aside

from increasing the length in some slight degree, and very materially increasing the cost of construction apart from and in addition to the cost of an overhead crossing.] [7]

" [5th. That the line of the Altoona & Philipsburg Connecting Railroad, on account of the prior location and construction of Mapleton branch No. 3, and the nearness of the Moshannon creek at this point to the hillside, in order to construct an overhead crossing at this point, would be compelled to construct a retaining wall along Moshannon creek, on the southerly side of the point of crossing, and also construct a like wall of some height between the line of the Altoona & Philipsburg Connecting Railroad and the right of way to the Mapleton No. 3 branch, thus adding very considerably to the cost of constructing an overhead crossing.] [8]

" [6th. That after full and careful consideration of the testimony of the engineering experts called by the plaintiff and defendant companies, making due allowance for any apparent magnifying of the expense of crossing on one, and of minimizing of the expense on the other, and considering the character of the line crossed, and it being in an open country, a coal branch with but one freight train entering daily thereon, we find as a fact that to compel an overhead crossing would be imposing an unreasonable burden on the plaintiff company, and that an overhead crossing is not reasonably practicable.] [9]

## " BIG RUN BRANCH.

" [1st. This branch was constructed within the last four years and is about two and one half miles long. It was built for the purpose of shipping what was supposed to be a considerable acreage of the Moshannon or 'D' vein, but this vein was, and is, entirely cut out by a fault, and, so far as there is any testimony in the case, has not been found.] [10]

" [2d. That very small freight shipments have ever come from this branch at any time since its construction, and not more than three, four or perhaps a few more cars per diem can be produced on this branch until more development is made on the C or 'C' vein, or the measure underlying it known as the 'B.'] [11]

" [3d. That to change the line of the plaintiff company, as indicated on defendant's plans, to make an overhead crossing at a point different from the point located by the plaintiff company,

would impair seriously plaintiff's line, increase the cost of con
struction much more than it would diminish the cost of an over-
head crossing as now located.   The amount of injury that
would be done defendants, or the inconveniences that will be
suffered will be slight indeed.] [12]

"[4th. That there are no circumstances that require an over-
head crossing of this branch, and as a fact it is not reasonably
practicable, and ought not to be required.] [13]

### "COAL RUN BRANCH.

"1st. That this branch was constructed a distance of four
miles, more or less, originally, and was subsequently extended
until at the present time it is about eight miles long.   The pur-
pose of the construction of the first four miles was to develop a
body of the Moshannon vein coal, and the extension thereto
was built to reach a body of fire clay.

"2d. No passenger trains are run up this branch at the pres-
ent time, and there never has been any since its construction.

"[There is but one freight or coal train enters upon it daily
with empty cars, and distributing and returning with whatever
loaded cars of coal or fire clay there may be.   No other trains
of the defendant company pass the point of crossing.] [14]

"[The quantity of Moshannon coal is very much reduced by
shipments until nearly exhausted, and the dip of the measures
toward the line of axis of the basin is such that the proper point
for profitable and economical development of the lower meas-
ures of bed 'B' would be much nearer the line of defendant's
main stem of road.] [15]

"[4th. That, passing from Philipsburg or Osceola toward the
south, the hill approaches near the stream and near the line of
both defendant's main road and also the road of the plaintiff
company, and that, owing to this, the point of crossing could
not reasonably be located otherwise than as located by the plain-
tiff company, without great expense and bad curves.] [16]

"[5th. That there are no houses near this, and no populous
community about the point of crossing.   That an overhead cross-
ing is not reasonably practicable at this point because of the
topography of the country, and the large cost and expense that
it would entail.] [17]

"[6th. That any injury done, or inconvenience to the defend-

ant company, in the operation of this branch, is such that it can be compensated in damages.] [18]

### "GOSS RUN BRANCH.

"1st. This branch was originally built more than twelve years ago. The main branch was something over two or more miles long, and was in fact three branches within itself.

"2d. It was originally built to reach the Moshannon vein or 'D' coal lying to the north of Houtzdale in a very considerable acreage, and the town of Brisbin was built thereafter.

"[3d. The Moshannon vein of coal on this branch is practically exhausted. There is a quantity of the cap vein which can be shipped over this branch. This overlies the Moshannon vein in the hill, and is much more limited in acreage and the vein is much thinner, making the quantity of coal to be shipped therefrom necessarily much smaller.] [19]

"[4th. The 'B' measure is quite deep underneath, and dips toward Beaver run, the line of axis of the basin, and naturally making that the place where future shafts and developments would be expected to be placed.] [20]

"[5th. The amount of freight shipped from this branch is small. Not more than one train of empty cars entering daily, and the engine returning with the loaded cars.] [21]

"6th. But this branch is operated as far as Brisbin borough for passenger traffic, and the trains run up and back out going southwest towards Houtzdale, and back up and run out going northeast from Houtzdale six times, causing the train to pass over the point of crossing twelve times daily, counting its passage both going and returning.

"[7th. The point of crossing is in an open country, no town or populous community exists at the point sought to be crossed, and therefore, taking into consideration the topography of the country, and large expense of constructing an overhead crossing, the amount of traffic on the line, that with proper signals the danger would be very slight, we find that an overhead crossing is not reasonably practicable and ought not to be required.] [22]

"[8th. The inconvenience of operating this branch on account of a grade crossing and the consequent injury to the defendant company is also of such character that it can be compensated in damages.] [23]

## "AMESVILLE BRANCH.

" 1st. This branch was built about six years ago, and is now about seven miles long. It was not all built at one time, but was first constructed some three miles for the development of the Moshannon coal measure. Since that it has been extended until now it has reached a point where a very large body of the lower coal measure or bed 'B' can be developed and mined through drifts above water level, and by additional short extensions this area can and will be largely increased.

" 2d. That no passenger trains are now run upon this branch, but the operation and development of this branch would reasonably indicate that it is highly probable that such trains will be run in the future, as the development increases and the line extends farther out, reaching points distant from Houtzdale.

" 3d. That the freight traffic on this branch is very considerable at the present time, and, with the extension of the line and development of the increased area, will necessarily continue so for a long time, if not actually increase in quantity in the near future.

" 4th. That the maximum grade on this branch is about three feet in one hundred, making a very heavy grade for trains of loaded cars approaching from the direction of the mines toward the point of crossing, thereby increasing the difficulty of holding the train and the liability of collision. That, near the point of crossing, this branch has an embankment of about twelve feet, and the defendant company has placed on record in the case a consent duly executed by the proper officials to allow an increase of that embankment to an additional height of six feet, at the cost and expense of the plaintiff company.

" 5th. That an undergrade crossing is reasonably practicable of this Amesville branch, and ought to be required.

## "THE LAW.

" As has already been stated, the cardinal question in this case is, whether, under the facts disclosed by the testimony, overhead crossings are reasonably practicable at Mapleton branch, Big Run branch, Coal Run branch, and Goss Run branch, and an undergrade crossing at the Amesville branch.

" The policy embodied in the 'Crossing Act,' of the 19th of June, 1871, P. L. 1361, has received judicial recognition and

construction. In P. & C. Railroad Company v. Southwest Pennsylvania Railroad, 77 Pa. 175, it was said: ' Two thoughts are already expressed in the statute. The one that no unnecessary injury shall be perpetrated on the road sought to be crossed; the other, that crossings at grade shall be prevented whenever they can reasonably be avoided. The very language used implies that one railroad cannot be crossed by another without some injury to the company whose road is crossed. But if the injury is not such as will deprive the company of the exercise of its corporate rights, or seriously impair its operations, and is susceptible of compensation in damages, there is no reason why a railroad company should claim immunity any more than other corporations or individuals. The development of the country and promotion of its prosperity, for which all corporate powers are conferred, are weightier considerations than private interests or the convenience of corporations.' This language, and much more, particularly applicable to the case in hand, was quoted and approved by our present Chief Justice STERRETT, in Northern Central Railway Company's Appeal, 103 Pa. 621–628.

" This doctrine thus enunciated not only defines the policy that is embodied in the act of 1871, and which looks to the protection of the rights of the road sought to be crossed, and the avoidance of danger to the life of the employees and the traveling public, but it goes further and fixes the limitations thereof by declaring that the public policy of the state to foster and encourage the improvement and development of the country and the material resources thereof must not be dwarfed and wholly overlooked.

" Railroad corporations being created to serve the public must submit to slight inconveniences where the public interests are concerned, and this is particularly true in all cases where compensation can be made in damages for the injury and inconvenience inflicted in permitting crossings at grade. It has been held in this state that ' their franchises, like other property, may be taken by the public for the public welfare, where there exists a necessity for such taking:' Pittsburgh Junction R. R. v. Allegheny Valley R. R. Co., 146 Pa. 297.

" In the disposition of the facts in this case that partake in their nature somewhat of conclusions of law, particularly as to

the reasonable practicability of crossing otherwise than at grade, we have been guided in our inquiry by these principles thus enunciated, namely: (*a*) Is there unreasonable injury to the road crossed? (*b*) Is there considerable danger to the public? (*c*) Does the development of the country seem to require a grade crossing? (*d*) Can the injury and inconvenience to the road crossed be reasonably compensated in damages?

" That these are all vital subjects of inquiry and to be kept in view by the court is plainly indicated in the language of the Supreme Court, speaking through STERRETT, J., in N. C. R. R. Co.'s Ap., 103 Pa. 629, wherein he says: ' The practicability of an overhead crossing depends almost entirely on the circumstances of each particular case. It is always a question of fact or rather a conclusion drawn from a variety of independent facts and circumstances. The location and surroundings of the proposed crossing, the character of the railroads, and the uses made and intended to be made of them, the increased cost, the expense of construction and operation, the public safety and convenience, the interests and convenience of the roads intended to be crossed are some of the factors that enter into the solution of the question of the reasonableness of an overhead crossing.'

" And the same rule must necessarily apply to an undergrade crossing. Guided by these rules we have endeavored to examine the testimony submitted, to set forth the facts and circumstances somewhat in general as to all the different crossings, and in detail as specially applicable to each separately, and have drawn such conclusions therefrom as the same warrant.

" Nothing remains for us but to frame such decree in each particular crossing as will conform to the conclusions reached, and will guard and promote the interest and convenience of the public as well as the rights of the parties to this proceeding.

### " DECREE OF COURT.

" [And now, Oct. 27, 1893, this cause coming on to be heard by the court upon the testimony taken and being fully argued, it is adjudged, ordered and decreed: That an injunction be, and is hereby awarded, enjoining and restraining the defendant company from interfering by its agents, employees and workmen, from interfering with the plaintiff company from crossing the defendant company's branches at grade, and for that

purpose putting in place the necessary crossing frogs and other material for that purpose, save as modified by the special decree entered and as made to apply to the separate branches sought to be crossed, as specifically set out hereafter.

" 1. That the plaintiff company shall have the right to construct and operate its railroad across the roadway and tracks of the defendant company's branch lines at grade, and over its adjoining land or right of way on the location of the plaintiff company at the Mapleton branch, Big Run branch, Coal Run branch and Goss Run branch, subject, however, to the payment, when hereafter legally ascertained, of such damages as the defendant company may thereby have sustained and suffered.

" 2. Such crossings to be constructed by the plaintiff company at its own cost, under the supervision of the defendant company's engineer or agent. But if the defendant company refuse to send its engineer or agent to supervise the construction thereof, after three days' notice, plaintiff may proceed without delay to construct the same, and to place the crossing frogs in position.] [24]

" 3. That the plaintiff company shall have the right to construct and operate its railroad underneath the defendant's roadway and tracks, and across its adjoining land or right of way at the Amesville branch, on a location to be agreed upon by the engineers of the plaintiff and defendant companies, or, on failure to agree, to be fixed by further order of the court, upon application made for that purpose. And the defendant company, having filed in this case a written stipulation of its willingness to elevate its line at the point where an undergrade crossing is located as aforesaid, it is further ordered that the said defendant company shall, within ten days of the entry of this decree and notice thereof, submit specifications of the plans for said elevation to the engineer of the Altoona & Philipsburg Connecting Railroad Company, and should the same be not accepted, then the same shall be submitted to the court, within five days thereafter, for examination and such further order as the court shall deem necessary to take therein. The defendant company shall construct said elevation, and shall forthwith, upon the acceptance of said plans and specifications, proceed without unnecessary delay to do the work, subject to the inspection of the engineer of the plaintiff company or its

duly authorized agent. The cost of raising the said branch to be paid by the plaintiff company on the estimates of an engineer to be appointed by the court and under its supervision, unless the parties hereto agree upon the same. The work of elevating said line to be completed on or before the first day of February, A. D. 1894. The work of putting into place the necessary pillars or supports for the bridge across the undergrade crossing to be placed in position by the plaintiff company, and the necessary bridge and other material therefor shall be furnished at its cost and expense.

" [4. That each of said crossings shall be kept in good condition by the plaintiff company, and the expense of repairing and renewing the same or any part thereof shall be borne by it. The chief engineer of the defendant company shall give thirty days' notice whenever possible, and designate in what manner and to what extent repairs or renewals shall be made, and if any unnecessary delay occur by the plaintiff company in making the same, he may at his option make the same and the plaintiff company shall pay the expense thereof. And if any disputes or disagreements arise, the same shall be brought before the court by the party aggrieved for settlement.

" 5. That the plaintiff company shall keep a careful and competent watchman at the Mapleton, Big Run and Coal Run crossings to guard and watch the passing of all trains and signal the same. All passenger and freight trains of the plaintiff company must slow up and approach the points of crossing for a distance of one thousand feet at a rate of speed not exceeding six miles per hour. When the trains of defendant and plaintiff companies shall both be approaching and be within five hundred feet of the point of crossing on these branches, the trains, cars or engines of the defendant company shall have the right of way or first right to pass the point of crossing.] [25]

" [6. That plaintiff company shall erect and maintain, so long as passenger trains are run thereon, a signal tower at or near the point of crossing the Goss Run branch with a suitable signal apparatus such as the Semaphore Interlocking Signal, at an expense not exceeding twelve hundred dollars, and shall keep a competent and careful watchman there at all times, whose duty it shall be to guard the said crossing by proper signals. The place where said tower and signal apparatus

shall be erected and maintained shall be determined by the chief engineers of the plaintiff and defendant companies, or their duly authorized agents, without unreasonable delay, and upon five days' notice to defendant's superintendent. The cost and expense of procuring and erecting said tower and signals, and the subsequent expense of maintaining the same in good condition shall be borne by the plaintiff company, together with the wages of the watchman thereat employed.] [26]

" [7. That at the crossing of the Goss Run branch in the use and operation of plaintiff company's railroad at or near the point of crossing, trains, engines or cars of the plaintiff company shall come to a full stop at a distance at least 300 feet from the point of crossing and shall not proceed until a proper signal shall have been given by the watchman in charge of the signal apparatus. When trains or engines on both the plaintiff and defendant companies' lines shall approach the crossing at the same time and are within 500 feet of the crossing, the train or engine of the defendant company shall have the right of way or shall first pass the point of crossing.] [27]

" 8. That the plaintiff company shall construct an overhead crossing over the main stem of the Moshannon & Clearfield Railway at the point located by it, at or near Ramey, the bridge to be well supported upon iron pillars or stone abutments and supports, with a clearness of twenty feet, and a span of not less than sixty feet, and that notice of at least five days shall be given to defendant company's superintendent at Tyrone of plaintiff's desire to proceed with the erection of such supports, pillars or abutments, and the work to be supervised by the defendant's agent or engineer; and, should disagreements arise, the party aggrieved may forthwith apply to the court for adjustment thereof and permission to erect the same. The bridge to be placed thereon to be of iron or steel, and according to the usual character of such structures.

" 9. That either party to this bill may, upon ten days' written notice, where the time is not already hereinbefore fixed at a shorter time, to be given to any of the officers of the other company, apply to the court, if in session, and, if not in session, at chambers, for such modification or addition to these regulations as experience and observation show that the safety of persons or property, or the rights of the party, seem to require.

" The costs in this case to be paid by the plaintiff company."

*Errors assigned* were (1–27) portions of opinion and decree in brackets as above, quoting them respectively.

*Thomas H. Murray* and *David W. Sellers*, for appellants.— The test of whether a grade crossing should be granted is a different question now from what it was formerly. The present rule is that no grade crossing is to be permitted except in a case of imperious necessity: Perry Co. R. R. v. R. R., 150 Pa. 193; Penna. R. R. v. Electric R. R., 152 Pa. 126; Pittsburgh Junction R. R. v. R. R., 146 Pa. 297.

In the present case the question is not merely a question of a grade crossing nor of two, but of five within about six miles, and that without any pretence of absolute necessity. In this respect the proceeding and decree are wholly unprecedented.

The weight to be given to a conclusion by a master or court respecting matters of fact depends largely on whether it is finding of fact directly proven by the witnesses, or merely a deduction from other facts proven by them and reported by him. If it is of the latter kind it is of much less weight, as it is simply a process of reasoning, the correctness of which this court is entirely competent to judge of, and which must be judged of by its application to the facts to which it stands related: Phillips's Ap., 68 Pa. 138; Sproull's Ap., 71 Pa. 138; Kutz's Ap., 100 Pa. 79.

*Joseph B. McEnally*, *Daniel W. McCurdy* with him, for appellee.—Even in populous places, railroads doing a large business, running frequently both day and night, and having the prospect of a continuous future increase of business, are allowed to cross each other at grade, if such grade crossings are made reasonably safe and the burden of expense and disadvantages imposed by an overhead or undergrade crossing would be such as to oppress or seriously injure the railroad seeking the crossing. In such cases it is not regarded as being reasonably practicable to avoid a grade crossing. The reasons for avoiding a grade crossing are much weaker when the railroads to be crossed. as in the present case, are in the country or in sparsely populated places, and are not lines doing a large business, but are

mere lateral branches extending only a few miles to coal or other mines, and used chiefly for the purpose of carrying back the product of the mine, doing only a small business, and having no certain future before them, but rather the prospect of a diminishing business until the mines which supply them are exhausted: Nort. Cent. Ry. Co.'s Ap., 103 Pa. 622; Pa. R. R. Co.'s Ap., 116 Pa. 55; Balt. & Cumberland Valley R. R. Co.'s Ap., 10 W. N. 530; Perry Co. R. R. Extension Co. v. Newport & Sherman's Valley R. R., 150 Pa. 193; Pa. R. R. v. Braddock Electric Ry., 152 Pa. 116.

The judge who performed the duties of a master in this case had superior opportunities for reaching a correct conclusion. In case of a master's report where the testimony is conflicting, although the merits may appear contrary to the finding, if it has been approved by the court below, as a general rule this Court will not reverse: Kutz's Ap., 100 Pa. 79; Sproull's Ap., 71 Pa. 138; Phillips's Ap., 68 Pa. 138.

OPINION BY MR. CHIEF JUSTICE STERRETT, April 2, 1894:

This bill, brought against the Tyrone & Clearfield Railroad Co. and others, lessees, etc., avers, inter alia, that plaintiff company was organized July 12, 1892, and proceeded to locate a railroad from Phillipsburg to Janesburg in Clearfield county; that the route of said road crosses the following five branches of said Tyrone & Clearfield Railroad Co., viz.: (1) Mapleton, (2) Big Run, (3) Coal Run, (4) Goss Run, and (5) Amesville, all of which branches plaintiff proposes to cross at grade; that it is not reasonably practicable to avoid grade crossings; and praying the court to declare plaintiff company's right to such crossings, and the mode thereof, etc.

The answer demands proof of the several averments, as to organization, location, rights of way, work on the line, etc., and denies the averment that it is not reasonably practicable to avoid said grade crossings, etc.

Without the aid of either examiner or master, the learned judge of the common pleas heard the testimony and filed an opinion, finding, inter alia, that, as to each of the first four named crossings, it is not reasonably practicable to avoid crossing at grade, and he accordingly entered a decree that, after three days' notice to defendants, said crossings be placed, etc.,

granted an injunction restraining interference with said work, etc., and provided in detail for the maintenance and use of said crossings, as will fully appear by reference to said decree. As to the Amesville branch, he decreed "that the plaintiff company shall have the right to construct and operate its railroad underneath the defendant's roadway and tracks," as is fully set forth in the 3d paragraph of his decree. This undergrade crossing does not appear to be the subject of complaint in any of the specifications, and may therefore be dismissed without further notice except in sustaining that part of the decree. A considerable portion of the learned judge's opinion is devoted to a consideration of the topographical features of the territory, traversed by the projected and constructed roads in question, together with the position and importance of said territory in its geological aspects as a freight-producing field, etc. As to some of these matters, he appears to enjoy the advantage of a personal knowledge of the locality which we do not possess. His consideration of the subjects referred to is followed by a statement or findings of fact, bearing on the merits of the controversy, in relation to each of said proposed grade crossings, and from all these are drawn the general conclusions on which the decree is based.

It does not appear that an opportunity of excepting to the opinion was afforded, and hence many of the matters above referred to are for the first time subjects of complaint in several of the specifications of error.

It is not our purpose, nor do we deem it necessary to consider said specifications in detail. In our opinion, the contention hinges on the soundness of the general conclusions on which the decree appears to be based. A careful consideration of all the testimony has led us to the conclusion that the learned judge underestimated the present and prospective importance, to the defendants as well as the public, of the four branch roads over which grade crossings are sanctioned by the decree, as well as the danger, inconvenience and ultimate loss that are likely to result from such crossings, if the decree is permitted to stand. On the other hand, we think he has attached undue importance to the increased costs of constructing, increased expense and difficulty of operating plaintiff company's road, and other injurious consequences likely to result to it as well as the public from prohibiting said grade crossing.

It may be conceded that the increased cost of construction, with over or undergrade crossings, will be very considerable; but, on the other hand, the compensation for that increased outlay can scarcely be overestimated. Four dangerous, expensively constructed and maintained grade crossings, within a distance of about eight miles, with the expense, inconvenience, delay, loss of life and property necessarily incident thereto, are avoided, not for a few years but for all time, and in lieu thereof a clear and unobstructed roadway and tracks are permanently secured.

While the learned judge refers to estimates of increased cost of over-grade as compared with grade crossings, he has not given us any distinct and definite finding on that subject. As is usual in such cases, the witnesses of the respective parties differ widely in their estimates. Those of the defendants range from about $36,000 to $46,000, for all four crossings, or an average of from $9,000 to less than $10,000 each, depending somewhat on the mode of construction, materials, etc. They profess to give the data upon which their calculations are based. The plaintiffs' estimates, on the other hand, are about one hundred per cent higher. Making proper allowance for these discrepancies and giving due weight to the respective witnesses on the subject, we think an estimate of $12,000 to $15,000 for each crossing would not be much out of the way. To what extent the witnesses took into consideration the cost of constructing grade crossings and signals, keeping a watchman at each, etc., as required by the decree, does not clearly appear; but the necessary outlay would certainly be very considerable. The annual expense of maintaining the crossings, including watchmen's salaries, etc., if capitalized, would be no insignificant sum.

The alleged increased expense and difficulty of operating plaintiff's road with over-grade crossings as compared with crossings at grade is not so serious as some of their witnesses appear to think. The maximum grade of their road, as shown by the evidence, is about one and a half feet to one hundred feet, or about seventy-nine feet to the mile. The weight of the testimony is that the grade of overhead crossings need not exceed sixty or eighty feet to the mile.

As was said in Northern Central Railway Co.'s Appeal, 103 Pa. 629, the practicability of overhead crossings depends almost

entirely on the circumstances of each particular case. It is always a question of fact, or rather a conclusion drawn from a variety of independent facts and circumstances. The location and surroundings of the proposed crossing, the character of the railroads and the uses made and intended to be made of them, the increased cost of construction and expenses of operation, the public safety and convenience, the interests and convenience of the road intended to be crossed, are some of the many factors that enter into the solution of the question of the reasonableness of an overhead crossing in almost every case; and the same may be generally said of undergrade crossings.

The act of 1871 requires courts of equity " to ascertain and define by their decree the mode of crossing which will inflict the least practicable injury upon the rights of the company owning the road . . . . intended to be crossed; " and " by their process prevent a grade crossing " whenever in their judgment "it is reasonably practicable to avoid such crossings." The necessity, which, nearly a quarter of a century ago, moved the legislature to enjoin these duties on the courts, is now greater than ever; and in several cases, among which are Perry County R. R. Co. v. N. & S. V. R. Co., 150 Pa. 193, and Penna. R. R. Co. v. Electric Railway Co., 152 Pa. 126, we have had occasion to emphasize the importance of the ever increasing and now almost imperative necessity of prohibiting grade crossings. That constantly growing necessity has more than kept pace with the rapid multiplication of railroads and urgent demands for high rate of speed, few stoppages, etc. But it is unnecessary to enlarge on the many considerations that are opposed to grade crossings, and the comparatively few that can be even plausibly urged in their favor. After fully considering and carefully weighing all the facts and circumstances which make for as well as against the reasonable practicability of avoiding the proposed grade crossings, we have reached the conclusion that the learned court below erred in not adjudging and decreeing that it is reasonably practicable to avoid each and all of said grade crossings.

It is therefore adjudged and decreed as follows:

1st. That so much of the decree of the court below as authorizes the undergrade crossing of the Amesville Branch specified in the third paragraph of said decree, and also so much of

said decree as in any manner relates to the construction, maintenance and operation of said undergrade crossing, be affirmed with costs, including the costs of this appeal, to be paid by the plaintiff.

2d. That so much of the decree of the court below as authorizes grade crossings at either of the four points named therein, and also so much and such parts of said decree as in any manner relate to the construction, maintenance and operation of said crossing, and any of the appliances intended to be connected therewith, be and the same are hereby reversed and set aside; and, in lieu thereof, it is now adjudged and decreed that it is reasonably practicable to avoid each and all of. said four grade crossings.

3d. That so much of the decree of the court below, as is not hereinbefore mentioned, referred to and disposed of, be and the same is hereby reversed; and it is further ordered that the record be remitted to the court below for such further action as may be necessary to carry into effect the provisions of this decree.