The Chester Traction Company and the Union Railway Company of Chester, Pa., *v.* the Philadelphia, Wilmington and Baltimore Railroad Company, Appellant.

*Railroads—Street railways—Crossings—Equity—Act of June* 19, 1871.

Under the Act of June 19, 1871, P. L. 1360, courts of equity in Pennsylvania will not permit the construction of grade crossings, except in cases of imperious necessity.

The question of whether an overhead crossing is reasonably practicable is not to be determined by the financial ability of the road seeking to cross, but by the physical practicability of avoiding the grade crossing.

The mere fact that two grade crossings which a street railway company has over a steam railroad are not of sufficient capacity to enable the electric railway quickly to move its cars does not constitute such "imperious necessity" as will justify a court of equity in permitting a third crossing, inasmuch as grade crossings are not to be established to promote the mere convenience of the railroad seeking to cross.

The fact that heavy damages may be exacted by passengers from railroad companies as a penalty for neglect to carry safely has but little weight with a court of equity in determining whether or not a grade crossing shall be permitted.

A court of equity will not authorize the construction of a grade crossing by an electric railway over a steam railroad in a city of twenty-five thousand inhabitants, where it appears that at the proposed crossing one hundred passenger trains and almost the same number of freight trains pass in twenty-four hours; that the electric railway carried over three million passengers in the year; that at the point proposed there is much shifting of cars owing to the vicinity of a freight warehouse; that the view of the electric railway from the steam railroad is obstructed; and that an overhead crossing would cost from $150,000 to $200,000.

The act of 1871 is, in effect, a mandate to the courts to prohibit grade crossings, unless over or under ones are physically impracticable, and unless crossings be an imperious necessity. The courts have no power to determine how they shall be avoided, or equitably to apportion the expense among those interested. We must administer law as we find it, and not as we think it ought to be.

Per DEAN, J.

Argued Feb. 9, 1898. Appeal, No. 199, Jan. T., 1897, by defendant, from decree of C. P. Delaware Co., March T., 1895, No. 5, on bill in equity. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity under the act of June 19, 1871, for a decree

to regulate the construction and maintenance of a grade crossing. Before CLAYTON, P. J.

The bill prayed for an injunction to restrain the defendant, a steam railroad company, from resisting or interfering with the maintenance of a street railway or trolley wire on Welsh street, in the city of Chester, crossing the defendant's tracks, and also praying the court to make a decree for the manner of constructing the railway over the railroad, and for its future mainte-nance, under the provisions of the second section of the act of June 19, 1871, P. L. 1360, entitled "An act relating to legal proceedings by or against corporations." The defendant filed an answer averring that the proposed crossing by the plaintiff company was not demanded by any requirement of public con-venience, but was simply to enable the plaintiff to more conven-iently operate its lines; that such crossing would be dangerous to persons and property; and denied that the plaintiff was clothed with full legal power and authority to construct and maintain its railway and trolley wires over the tracks of the de-fendant at grade, and averred that the resistance of the defend-ant to such construction was legal.

The case was heard on bill, answer and proofs, and the court entered the following decree:

The plaintiff has leave to string its wires across the defend-ant's road at a point where it crosses the defendant's road at Welsh street at a height of at least twenty feet above the top of the defendant's road as now constructed. As the stringing of the wires may interfere with the operation of the safety gates already constructed, new gates shall be provided of equal safety at the expense of the plaintiff's company, and until so provided a watchman shall be maintained at said crossing with a flag to warn travelers on said street, and every approaching electric car, of an approaching train, and no electric car shall cross or attempt to cross the said railroad until signaled to do so by said watchman.

When any car propelled by electricity shall approach the said defendant's railroad it shall come to a full stop at least twenty feet from the safety gates, whether said gates are up or down. If said gates are up, the conductor shall cross the entire rail-road tracks, and look both up and down said railroad to ascer-tain whether any car, train or engine or other vehicle may or

may not be approaching.   If the track is free from all danger, he may give the signal for the car to cross, otherwise he shall not attempt to cross said track.   If the safety gates are in working order, and down when the electric car shall approach, it must stop at the distance above prescribed until said gates are raised, when it may cross without the conductor being require to go upon the said railroad as provided when said gates are up.

Either party has leave to move to amend, modify or change this decree as necessities for public safety may demand or new inventions for the prevention of accidents may be discovered. If the parties cannot agree as to the time and manner of crossing, then it is ordered that all the expenses of the said crossing shall be paid by the plaintiff; the frogs, rails, etc., necessary, shall be of the most approved pattern, and shall be subjected to the inspection and approval of the defendant's company before being laid in place.   The rails and tracks of the defendant's company shall not be interfered with so as to hinder or delay the passage of its trains or to subject it to any danger from accident without its consent.   All the materials for the said crossing shall be prepared, be on the ground and ready to be put in position when the defendant shall have at least forty-eight hours' notice as to the day and hour when said crossing is to be made, so that the defendant shall have ample time to examine and approve or disapprove, as well the mode or manner of crossing the said road, as the time selected for said work, and if the defendant disapprove of either, it has leave to apply to the court for an injunction to restrain said work until it shall be satisfactory to the defendant or be approved by the court.

The costs of the record of this proceeding to be equally divided between the parties, each party to pay his own part of the cost.

*Error assigned* among others was decree of the court.

*J. B. Hannum* and *John G. Johnson,* for appellant.—Anyone claiming to be injured by a corporation can set up the invalidity of its charter: Lehigh Coal & Nav. Co. v. Ry. Co., 167 Pa. 75; Thomas v. Ry. Co., 167 Pa. 120; Venango Co. v. Oil City Ry. Co., 170 Pa. 249; Homestead Ry. v. Ry. Co., 166

Pa. 167; Cook on Stockholders and Corporation Law, sec. 637; In re Brooklyn, W. & N. Ry. Co., 72 N. Y. 245; In re N. Y. Cable Co. v. Mayor, 104 N. Y. 1; Western Pa. R. R. Co.'s App., 104 Pa. 399; Germantown Ry. Co. v. Citizens' Ry. Co., 151 Pa. 138; Pa. R. R. v. Mont. Co. Ry. Co., 167 Pa. 73; Potts v. Elevated R. R. Co., 161 Pa. 396; Taylor on Private Corporations (3d ed.), sec. 154.

There is no such imperious necessity for this crossing as would justify the court in allowing it at a point already so dangerous to public travel.

The intent of the act is to discourage grade crossings involving danger to the public, as well as injury to the company: Pittsburg & C. R. R. v. S. W. Pa. Ry. Co., 77 Pa. 173; Perry Co. R. R. v. Newport & Sherman's Valley R. R., 150 Pa. 193; Penna. R. R. v. Braddock Electric Ry., 152 Pa. 116; Traction Co. v. Canal Co., 180 Pa. 636; Penna. R. R. v. Electric Ry., 152 Pa. 116; Altoona, etc., R. R. v. R. R., 160 Pa. 623; Traction Co. v. Canal Co., 180 Pa. 636.

The burden is on the plaintiffs to show their right to cross and the necessity for said crossing: Western Pa. R. R. Co.'s App., 104 Pa. 399.

*W. B. Broomall*, for appellee.—A court of equity will not, under the act of June 19, 1871, decree the construction of an overhead crossing where the cost of such crossing would be so great as to prevent the construction of the railroad: Pennsylvania, etc., R. R. v. Philadelphia & Reading R. R., 160 Pa. 277.

OPINION BY MR. JUSTICE DEAN, October 17, 1898:

The city of Chester, fronting on the Delaware river, has a population of about 25,000. Beginning at or near the river, about forty-five streets run north, intersecting other streets and avenues running east and west. The Philadelphia, Wilmington and Baltimore steam railroad crosses the city at grade from east to west and, therefore, is crossed by all the north and south streets of the city, among them Welsh street. For many years the railroad company maintained two tracks through the city, and at the commencement of these proceedings was constructing and about to lay down the rails on two more. By ordinances duly enacted the city granted to the Union Railway

Company the right to occupy with its railway certain streets, among them, Welsh street, from Fourth to Sixth; afterwards, the Chester Traction Company became the lessee of the Union, and claimed all the rights and privileges of the lessor company. It attempted, under the consent of the city theretofore granted, to lay its tracks on Welsh street, thereby crossing the steam railroad at grade; the latter resisted, and thereupon the plaintiffs filed this bill to enjoin defendant from any interference. The bill averred its charter and lease, the consent of the city and the necessity of the grade crossing in conducting its business in accordance with the terms of its charter. The defendant denied the legal right of the Chester Traction Company, under its grant, to occupy the street at all; it further denied that it was a necessity to the company to cross at grade at that point. After full hearing, the court below, in opinion filed, ruled in favor of plaintiffs in the issue on both points, and directed an injunction to issue. From that decree we have this appeal by defendant, assigning for error the findings of fact and conclusions of law by the court below.

Without at present noticing the assignment averring an absence of corporate right to lay its rails, by reason of the facts on which the charter was founded not existing at the date of the grant, we take up the one averring that there is no necessity for the crossing of Welsh street at grade.

The learned judge of the court below, says: "We also find as a fact, admitted by the respondent, that there is no other practicable manner by which the railway can cross the railroad at Welsh street except at grade. We also find that the proposed crossing is imperatively demanded and required by public convenience, and is necessary to relieve the congestion of public travel at the railway crossing at Market street, one square of about three hundred and ninety-five feet south of Welsh street."

So far as we can discover in the record there is no such admission by defendant. It is possible that counsel for defendant, although the record does not show it, made such admission at the hearing or in the argument in the court below; if so, he made no such admission before us; on the contrary, he based his argument in large measure on a denial of these facts. The averments in the answer to the bill are as follows:

"  . . . . Further, that, admitting that there is no other prac-

ticable manner by which the railway of the plaintiff can cross the tracks of the defendant at Welsh street except at grade, yet the defendant avers that there are other practicable methods by which the said railway company can cross the tracks of the said defendant at other points where the danger of the grade crossing at this particular locality might be avoided. Said defendant, however, denies that there is no other practicable mode by which the railway of the plaintiff can be constructed on Welsh street, and avers that the said railway can be constructed to cross the tracks of the said defendant, either above or below grade."

This is not, to our minds, an admission of the fact, but an assumption of it for the sake of the argument, and then an attempt to demonstrate that, even if such facts existed, there ought not to be a grade crossing at that point, because such crossing was not necessary to the transaction of the company's business.

Let us examine, first, the facts which should deter these parties from constructing a grade crossing at this point. One hundred scheduled passenger trains pass daily on the steam road; this would be an average of one every fourteen minutes of the twenty-four hours. No witness will undertake to give the number of freight trains, because they run irregularly, but on a main line between two such cities as Philadelphia and Baltimore, the number must be very great, and possibly equals that of passenger trains. The use of this particular part of the track is great, because of the location of defendant's freight warehouse near it, thus necessitating the cutting out and shifting of cars from trains. The view of the approaches of Welsh street from the steam railroad is obstructed, because of buildings on the sides of the streets. As to the extent of the use that would be made of the electric road at the crossings, we adopt the statement of its president, Mr. Lindsey. He says the purpose of the Welsh street crossing is to lessen the heavy traffic on Market street crossing, over which all the cars of all the companies now cross, except one line, which crosses at Morton avenue; that pretty close to three millions of passengers are carried over the Market street crossing yearly.

But one conclusion can reasonably be formed from these undisputed facts; a grade crossing is highly dangerous to the

traveling public on both roads. All precautions taken to avoid danger serve only to lessen it. The millions of passengers on the two roads are at the risk of the few railroad servants who have charge of them; recklessness, negligence, indifference or dullness on the part of the servants will still endanger life and limb of the passenger. While we are writing this opinion we have the news of the Cohoes accident, where the steam road was crossed at grade by the electric; every passenger in the electric car goes into one or the other of the two classes of sixteen killed and seventeen injured. The servants of each system attribute the accident to the negligence of those of the other. Increasing the number of crossings only increases the danger, by increasing the chances for collision. That this crossing is especially perilous follows, because of the frequent use of that particular spot of ground by both roads. This brings before us, the second section of the act of June 19, 1871 : "If, in the judgment of such court, it is reasonably practicable to avoid a grade crossing, they shall by their process prevent a crossing at grade." The meaning of this, as we decided in Perry County R. R. v. Railroad Co., 150 Pa. 193, is that the day of grade crossings is past, and they ought not to be permitted, except in case of imperious necessity. It is said by PAXSON, C. J., in that case, that in the earlier period of railroad construction the desire of the people for railroads tended to close their eyes to the danger; the traffic was light, and trains ran at long intervals. But, "the rapid development of the country, the enormous growth in wealth, population and business has materially changed the relations of railroads to each other and the public." In every case which has come before this Court since, Pa. R. R. v. Electric Railway, 152 Pa. 116, Altoona, etc., Railroad v. Railroad, 160 Pa. 623, Traction Co. v. Canal Co., 180 Pa. 636, and others, we have strictly adhered to this construction of the act. And we have further held, that what was reasonably practicable was not to be determined by the financial ability of the road seeking to cross, but by the physical practicability of avoiding the grade crossing. The plaintiff has shown by competent witnesses that the expense, approximately, of avoiding this grade crossing by one overhead would be from $150,000 to $200,000, while the entire capital stock of the corporation is but $500,000. But the financial inability of the company is not a test to de-

termine whether an improvement to carry safely three millions of passengers is reasonably practicable; otherwise, the poorer the company, the more unlimited its right to interfere with the exercise by the older company of its franchise, and the more freely can it disregard the safety of the traveling public. A corporation which undertakes to carry safely three millions of passengers, should provide a capital sufficient to build a superstructure which will not subject this multitude to avoidable risk at a crossing. The city of Philadelphia is built on low, flat ground; probably not essentially different from that on which Chester city is located. The same Delaware river washes its eastern boundary, yet it avoids grade crossings, not one or two, but dozens of them, by over or under structures. True, the expense is very great, and very much greater than if the grade crossings had never been permitted; but the fact that two steam roads reach the very center of the city, and that every street on their route will soon cross under or over them, demonstrates that it is reasonably practical to avoid them under the most unfavorable circumstances. We think, on the undisputed facts, proved by the plaintiffs themselves, an overhead crossing was reasonably practical, and the court below should have so found.

But the plaintiff already has two grade crossings, one at Market and one at Potter street. By the increase of the city's population and business there has been a great increase of travel; as a consequence, the two grade crossings are not of sufficient capacity to enable the electric railway to quickly move its cars. But that does not constitute "imperious necessity;" grade crossings are not to be established to promote the mere convenience of the railroad seeking to cross; the older company still has some rights under its charter, and the presumption always is that, as between senior and junior grants, the legislature did not intend that the later should interfere with the older. The legislature, by giving the right to cross at grade, could not have intended to seriously disturb or destroy the older franchise. Yet the able counsel for appellee does not shrink from the inevitable conclusion which follows his premise; for we quote the exact language of his argument: "As the population of Chester increases, and the travel upon these street railways increase, it is necessary to have additional facili-

ties in crossing appellant's railroad.  This railroad runs through the middle of Chester; the lines which have been built extending to the upper part of the city, and extending also to the boroughs of Upland, Media and Darby, require additional means of crossing this railroad.  It is to provide for this increased traffic that the crossing at this point (Edgmont avenue), and the crossing at Welsh street, a square eastwardly from this point, has been proposed."

That is, as travel increases on the electric railways, the number of grade crossings will be limited only by the action of city councils; eventually, there might be forty-five, one for every north and south street.  But, stimulated by like causes, travel and traffic on the steam road would also increase, and we would have the result of two railways wanting to occupy the same narrow strip across the city at the same time, almost every minute of the day.

Nor does the fact that heavy damages may be exacted by the passenger as a penalty for neglect to carry safely have much weight in the determination of the question; admit that a collision would cost one or the other company or both a heavy sum, that would mean a loss of dividends to the company, and a loss of life or limbs to the traveling public; the risks are not equal, and humanity shrinks from offsetting the one against the other.  Besides, by unnecessarily crossing at grade the older corporation has imposed upon it a heavier burden than that which, in strictness, was incident to its grant.  In addition to its obligation to carry safely on its own contract, it must be watchful that it does not injure those of the public carried by another corporation across its roadbed.  It cannot be maintained that such results as we have mentioned would not seriously impair the value of the older franchise.

We appreciate fully the difficulties of the situation; the electric railway, for the successful prosecution of its growing business, demands increased facilities for conducting it; if these facilities are to be obtained by additional inexpensive grade crossings it not only largely increases the peril of the public, but seriously obstructs the older company in the exercise of its franchise rights.  Proper overhead crossings involve an increase of capital stock, on which, probably, there could be no returns without increased fares to the public; or, a construction out of

gross receipts which means indefinite postponement of dividends to the present shareholders. But, the difficulty is not the creation of either corporation; the demands of the public have simply outgrown anything that could have been foreseen when the charters were granted, and when the exercise of their franchises was regulated by law. While every one admits that existing grade crossings ought to be abolished, and no further ones, except in the rarest cases, permitted, the existing legislation does not provide means equitably adequate to the end. More than once this Court has called attention to the necessity of such legislation; but nothing has been added to the provisions of the act of 1871, which, as a solution of the difficulty, is, in effect, a mandate to the courts to prohibit grade crossings, unless over or under ones are physically impracticable, and unless crossings be an imperious necessity. The courts have no power to determine exactly how they shall be avoided, or to equitably apportion the expense among those interested, as under the New York statute lately adopted. So we must administer law as we find it, and not as we think it ought to be.

We are of opinion that the decree, on both grounds, should be reversed: first, an overhead crossing is reasonably practical; second, no imperious necessity demanding additional crossings is shown.

As to the question raised from the fact that the Chester Street Railway Company, under a prior grant, had already laid a track upon Second street when the Union Railway obtained its charter for a route on the same street, in violation of the law of its creation, we do not pass upon it here. The case is ruled on the other questions. And while we do not doubt our authority, in a collateral proceeding, to pass upon the question as to whether the charter of the Union is wholly nugatory, we see no reason why we should unnecessarily exercise that authority in this case.

The decree of the court below is reversed and injunction dissolved at costs of appellee.